FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

00 MAR -7 PH 12: 5 !

U.S. DISTRICT COURT
N.D. OF ALABAMA

|  |  |  |
|---|---|---|
| PEAT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-99-S-2553-NE |
| | ) | |
| VANGUARD RESEARCH, INC., | ) | **ENTERED** |
| | ) | |
| Defendant. | ) | MAR -7 2000 |

### MEMORANDUM OPINION

This action is before the court on defendant's motion to dismiss, transfer, or stay.[1]  Upon consideration of the motion, briefs, evidentiary submissions, pleadings, and oral arguments of counsel, this court concludes that defendant's motion is due to be granted in part and denied in part.

### I. BACKGROUND

Plaintiff PEAT, Inc. ("PEAT") is an Alabama corporation that, along with its predecessors, "developed [a] high temperature thermal destruction and recovery waste processing system," known as TDR technology.[2] Defendant Vanguard Research, Inc. ("Vanguard") is a Virginia corporation "that generally provides services and

---

[1] This court was informed by defendant's counsel on January 21, 2000, that the parties had resolved plaintiff's motion to compel. (Doc. No. 26.)  Further, plaintiff's motion for leave of court to file supplementary evidentiary submission, filed February 11, 2000 (Doc. No. 32), is moot since it refers to items available to this court through judicial notice.

[2] Affidavit of Dr. Marlin Springer at ¶ 3, attached as Tab "1" to plaintiff's motion for leave to conduct limited discovery (Doc. No. 3).

products in the area of systems analysis, development, engineering and management."[3]   It "has both commercial and government[al] customers and has provided products and services in the areas of defense, space and geophysical sciences, environmental systems, information technology, and management."[4]

The factual and procedural background of this action, tortured as it may be, must be discussed at some length before addressing the merits of defendant's motion.   The following chronological summary sketches the main events relevant to an understanding of the relationships among PEAT, its predecessors, and Vanguard.

**A.    May 8, 1992**

Vanguard entered into a non-disclosure agreement with Mason & Hanger National, Inc. ("MHN") on this date, in anticipation of an agreement with MHN to market TDR technology.[5]   That agreement was non-reciprocal — MHN only promised to keep certain information furnished by Vanguard confidential.

**B.    June 30, 1992**

Vanguard entered into a marketing agreement with MHN on this date, for the purpose of developing Vanguard's "interest in using

---

[3] Declaration of Mel Chaskin ¶ 5, attached as Exhibit "A" to defendant's exhibits in support of its motion to dismiss, transfer, or stay (Doc. No. 7).

[4] *Id.*

[5] *See* Exhibit "B" to defendant's exhibits in support of its motion to dismiss, transfer, or stay.

2

plasma energy to incinerate hazardous wastes at extremely high temperatures, resulting in their transformation into useful product gases and a harmless, vitrified slag."[6] That agreement to "jointly market and secure contracts" noted that "MHN has technical expertise, capabilities and has developed a plasma energy waste processing system," while Vanguard "has special unique capabilities in the noncompeting field of engineering and technical services."[7] It contained no clause mandating that disputes between the parties be submitted to binding arbitration.

### C.  **February 7, 1994**

Vanguard entered into a confidentiality agreement on this date with Plasma Energy Applied Technology, Inc. ("Plasma"), a wholly-owned subsidiary of MHN, in anticipation of renewing the original marketing agreement entered into between Vanguard and MHN.[8]  That agreement was also non-reciprocal — Vanguard only promised to keep certain information furnished by Plasma confidential.

### D.  **June 30, 1994**

Plasma and Vanguard renewed the June 30, 1992 marketing

---

[6] Chaskin declaration ¶ 7.

[7] *See* Exhibit "B" to defendant's exhibits in support of its motion to dismiss, transfer, or stay, at 1.

[8] *See id.*

3

agreement on this date for two additional years.[9]   The renewal agreement, like the original, also contained no clause mandating that disputes between the parties be submitted to binding arbitration.

**E.   April and June of 1996**

PEAT became the successor-in-interest to Plasma in April of 1996.[10]   PEAT and Vanguard began negotiating the terms of a new, comprehensive agreement in June of 1996.[11]   Those negotiations culminated in the signing of a marketing and licensing agreement between the parties during December of 1997.   (That agreement is discussed in depth *infra*, at Section I.J.)

**F.   July of 1996**

PEAT acquired U.S. Patent No. 5,534,659 on certain aspects of its TDR technology.[12]   The patented technology allegedly operated to dispose of hazardous waste in the manner initially contemplated by Vanguard.[13]   Around that time or sometime before, Vanguard

---

[9] *See id.* (delineated as "Marketing Agreement for Waste Processing Systems").

[10] *See* Complaint (Doc. No. 1) ¶ 6.

[11] *See id.* ¶ 16.

[12] Plasma initially applied for the patent in 1994.  Dr. Marlin Springer, William C. Burns, and Thomas Barkley, all residents of Alabama, were named as inventors on the application.   PEAT acquired the rights to the patent upon succeeding Plasma.  Springer affidavit ¶ 4.

[13] *See* Complaint ¶ 6.

4

"developed a general system that could use different existing technologies [like TDR], which it called 'Plasma Energy Pyrolysis System' or 'PEPS™', and had this name registered as a trademark."[14]

**G.    October 28, 1996**

The parties executed a teaming agreement in Virginia on this date.  Vanguard, as prime contractor, and PEAT, as subcontractor, agreed to make a joint proposal to the Tennessee Valley Authority for use of the PEPS system, and employing TDR technology.[15]

> WHEREAS, the above identified parties have determined that, because of complementary capabilities, we will benefit from a teaming arrangement between our respective organizations in order to develop highly competitive technical and management proposals for the Plasma Energy Pyrolysis System (PEPS) for the TVA Environmental Research Center of the Tennessee Valley Authority, Muscle Shoals, Alabama .... [16]

To that end, PEAT granted Vanguard an "exclusive No Fee License" for U.S. Patent No. 5,534,659.[17]  The parties also entered into a reciprocal non-disclosure agreement: "During the term of this agreement, [Vanguard] and [PEAT] agree to receive from each other proprietary, confidential, and technical information and data ...

---

[14] Chaskin declaration ¶ 9.

[15] *See* Exhibit "C" to defendant's exhibits in support of its motion to dismiss, transfer, or stay.

[16] *Id.* at 1.

[17] *See id.* (delineated as "Amendment to 'Teaming Agreement' between Vanguard Research, Inc., and PEAT, Inc.").

for the purpose of pursuing the Plasma Energy Pyrolysis System (PEPS)."[18]

**H.   August 14, 1997**

PEAT confirmed on this date that it had issued Vanguard an exclusive license relating to the patented TDR technology.[19]

**I.   October 6, 1997**

PEAT and Vanguard were successful in their proposal to the TVA.  Vanguard was awarded Prime Contract No. 97-RKW-224746, known by the parties as the "Phase I" contract.  Work on the project was due to commence on this date.  (PEAT and Vanguard eventually finalized a subcontract relating to the TVA project during February of 1998, and that agreement is discussed *infra* at Section I.K.)

**J.   December 10, 1997**

The parties entered into a comprehensive marketing and licensing agreement on this date.[20]  The parties noted that:

> **WHEREAS PEAT** has invested substantial money and effort, and has conducted research and development on, and patented, a high temperature Thermal Destruction and Recovery (TDR) system, based on plasma torch technology, and is continuing to develop and improve the technology, and acquire additional patents, and;

---

[18] *Id.* (delineated as "Non-Disclosure Agreement").

[19] *See* Exhibit "D" to defendant's exhibits in support of its motion to dismiss, transfer, or stay.

[20] *See* Exhibit "E" to defendant's exhibits in support of its motion to dismiss, transfer, or stay.

6

. . .

**WHEREAS [Vanguard]** has special unique capabilities in the
field of engineering and technical services, and strong
capabilities in writing and winning U.S. Government
contracts, and has extensive contacts within various
government and commercial agencies, and;

**WHEREAS [Vanguard]** desires to reformat and/or re-label
**PEAT's TDR** test and emissions data, engineering
calculations, process model projections, and certain
diagrams, drawings, and other printed material, and
represent those data and materials as **"Plasma Energy
Pyrolysis System"** (PEPS) data and materials for general
marketing activities; and

**WHEREAS [Vanguard]** desires to market and offer for sale
**PEAT's TDR** systems under the name **Plasma Energy Pyrolysis
System (PEPS)** .... [21]  ⁻

---

[21] *Id.* at 1 (emphasis in original).  Article one of the marketing and
licensing agreement reiterates the points made above:

The purpose of this Agreement is to re-establish the relationship
between PEAT and [Vanguard] regarding [Vanguard's] marketing of
PEAT's patented TDR Systems, under [Vanguard's] own trademarked
name, PEPS, and the installation and support of PEPS in the field.

*The Agreement will continue and modify the previous relationship
established by the Marketing Agreement between [Vanguard] and Mason
and Hanger National originally executed and dated effective 30 June
1992, including the grandfathering of all previously approved
[Vanguard] customers as described in Appendix A to the 30 June 1992
Agreement.* ...

This Agreement will provide [Vanguard] certain freedom, as defined
herein, to develop and use marketing material derived from
intellectual property supplied by PEAT, to promote and offer for
sale to selected potential customers, a PEPS as defined herein, for
processing hazardous and non-hazardous wastes.   Submission of
proposals and contract negotiations will be governed by a "Teaming
Agreement" to be negotiated and signed for each specific project
arising out of this Agreement.

Exhibit "E" to defendant's exhibits in support of its motion to dismiss,
transfer, or stay, at 2 (emphasis in original).

The marketing and licensing agreement provided for project-specific subcontracts, such as the one executed by the parties with respect to the TVA proposal: "All proposals for the sale of a [Vanguard] PEPS will be the sole responsibility of [Vanguard], and PEAT will either serve as Subcontractor or PEPS Vendor, delivering a PEPS to [Vanguard], designed and built to [Vanguard] specifications."[22] Certain provisions from Articles 3 and 4 of that agreement are also relevant:

> All PEPS sales will be governed by a contract between [Vanguard] and the Customer, and a contract (or subcontract) between [Vanguard] and PEAT for the delivery of a PEPS Unit and certain services. The specifics of these contracts will be dependent on the Customer.
>
> 3.1  [Vanguard] — PEAT Project Contract (or Subcontract) Depending on the nature of the customer and project, [Vanguard] will negotiate a contract or subcontract with PEAT that will be for the delivery of a PEPS Unit, and certain services as necessary.  ...  The Contract/Subcontract for the delivery of a PEPS will include a License to Operate the system, with appropriate Licensing/Royalty Fees.  This License to Operate will be transferred to the System owner/operator when the PEPS ownership is transferred by [Vanguard].
>
> 3.2  Sole Source Supplier of PEPS Equipment Having received from PEAT, training, technical knowledge, know-how, engineering drawings, test data, and proprietary information in support of the licensing and marketing of PEAT's TDR technology under this Agreement, and since PEAT has not licensed (outside of Korea) any company or individual to manufacture TDR, [Vanguard] agrees to use PEAT as the sole source for manufacturing and providing

---

[22] *Id.* at 3.

all TDR/PEPS related efforts. ...

4.2  Description of TDR System: PEAT owns the exclusive
right, title and interest in a patented TDR System (US
Patent No. 5,534,659) composed of, but not limited to, a
Waste Feed System, a Processing Vessel, a Gas Treatment
System, Gas Analyzer(s), an Energy Recovery System, a
Molten Material Handling System, and a Supervisory
Control and Data Acquisition System, integrated into a
functional system, capable of processing a specified
type(s) of waste material. The System is delivered as a
system, based on existing or evolving TDR technology,
modified to meet customer system specifications, with
accompanying industry standard documentation necessary to
install, operate and maintain the system.

4.3  Licensing of Technology PEAT ("Licensor") will
grant a limited no-cost non-exclusive license ("License")
to [Vanguard] ("Licensee") to promote and offer for sale
within the limits and boundaries established herein,
**PEAT's Thermal Destruction and Recovery (TDR) System**
under [Vanguard's] trademarked name — **Plasma Energy
Pyrolysis System (PEPS)**; and to have limited access to,
and authority to reproduce and use, within the limits and
boundaries established by this Agreement, certain **PEAT
TDR Intellectual Property** necessary to support an
effective marketing and system support program. Licensee
shall not do, nor permit to be done, any act or things
contesting or in any way impairing or attempting to
impair any portion of Licensor's right, title or interest
in and to such Intellectual Property other than the
License granted hereby, and that it shall not in any
manner represent that it possesses any ownership interest
therein.[23]

Article 7 of that agreement provided that "[s]pecific rights and

remedies, in the event of default, will be negotiated and specified

---

[23] Id. at 4-6 (emphasis in original).

in each contract arising out of and under this Agreement."[24]   The

marketing and licensing agreement contained no clause mandating

that disputes between the parties be subject to binding

arbitration.

### K.   February 4, 1998

PEAT and Vanguard entered into Subcontract No. 1128-97-S-0001

on this date, for the purpose of executing the "Phase I" project.[25]

Section 34 of the subcontract established an alternative dispute

resolution procedure entitled "Settlement of Disputes."   The

initial paragraph stated that section 34 "shall not be construed as

granting privity of contract between the Subcontractor [PEAT] and

Customer [TVA]."[26]   The next three paragraphs nevertheless created

a procedure for the subcontractor to contest TVS's decisions

relating to the prime contract, where the subcontractor was

indirectly involved.   They provided, in relevant part:

> If a decision relating to the prime contract is made by
> the Government Contracting Officer and such decision is
> also related to this Subcontract, said decision, if
> binding upon the Prime under the prime contract, shall in

---

[24] *Id.* at 8 (emphasis supplied).

[25] *See* Exhibit "F" to defendant's exhibits in support of its motion to
dismiss, transfer, or stay, at 1.  The subcontract expressly recited an effective
date of October 22, 1997.  The significance of that date has not been explained
to the court, and is somewhat puzzling in view of the fact that the prime ontract
entered into between Vanguard and the TVA provided that work would commence on
October 6, 1997. *See supra* Section I.I.; Chaskin declaration ¶ 11.

[26] *Id.* at 15.

10

turn be binding upon the Subcontractor with respect to such matter. If the Subcontractor disagrees with any such decision made by the Contracting Officer and the Prime elects not to appeal such decision, the Subcontractor shall have the right to prosecute a timely appeal as permitted by the Prime Contract or by law. ...

If, as a result of any decision or judgment which is binding upon the Subcontractor and the Prime, as provided above, the Prime is unable to obtain payment or reimbursement from the Government under the prime contract for, or is required to refund or credit to the Government, any amount with respect to any item or matter for which the Prime has reimbursed or paid the Subcontractor, the Subcontractor shall, on demand, promptly repay any such amount to the Prime. ...

The Subcontractor agrees to provide certification that data supporting any claim made by the Subcontractor hereunder is made in good faith ... in accordance with the ... Contract Disputes Act .... If any claim of the Subcontractor is determined to be based upon fraud or misrepresentation, the Subcontractor agrees to defend, indemnify, and hold the Prime harmless for any and all liability, loss, cost, or expense resulting therefrom. [27]

The fifth and sixth paragraphs of section 34 provided, however, that

[a]ny dispute not disposed of in accordance with this provision shall be resolved by arbitration in accordance with the rules of the American Arbitration Association. The arbitration shall be conducted and held in Washington, D.C. Judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction. Each party shall pay its own costs of the arbitration. Pending any decision, appeal, or judgment referred to in this provision or the settlement of any dispute arising under this Subcontract, the Subcontractor

---

[27] *Id.*

> shall proceed diligently with the performance of this
> subcontract.
>
> Except for actions arising out of a Government audit of
> the prime contract, no action arising out of this
> Subcontract may be brought by either party more than two
> (2) years after the cause of action has occurred. [28]

Finally, a copy of the marketing and licensing agreement between

PEAT and Vanguard (see Section I.J. supra) was appended to the

"Phase I" subcontract.

## L.   Conduct of the Parties after December of 1997

The parties' performance of the "Phase I" project suffered

many setbacks, including an explosion while testing the PEPS system

at Vanguard's facility in Virginia during January of 1999.

Vanguard issued a "stop work" order on "Phase I" in February of

1999.[29]    That order was issued "in large part because PEAT's

billings grossly exceeded the cost estimates for PEAT's design

tasks on Phase I of PEPS."[30]   Finally, Vanguard informed PEAT in

September of 1999 that the subcontract should be considered

terminated, because PEAT's duties with respect to "Phase I" had

been substantially performed.[31]   Vanguard also procured a contract

---

[28] Id. (emphasis supplied).

[29] See Complaint ¶ 24.

[30] Declaration of Gordon A. Smith at ¶ 10.f, attached as Tab "B" to
plaintiff's summary of evidence in opposition to defendant's motion to dismiss
or transfer (Doc. No. 18).

[31] See id. ¶ 25.

for demonstration of a mobile PEPS unit for the United States Army in June of 1998 — the "Phase II" project.[32] Vanguard and PEAT disagreed on the scope of work to be performed by PEAT. PEAT continually referenced the marketing and licensing agreement in claiming that Vanguard was acting beyond the bounds of its contractual obligations: "The 'Scope of Work' provided that PEAT would 'assist' Vanguard in design and development of certain limited aspects of a mobile PEPS unit based on PEAT's TDR Technology, even though the Marketing and Licensing Agreement stated that PEAT would perform all PEPS design work."[33] Because of the parties' continual disagreement, they never entered into a subcontract relating to "Phase II," as provided for in the marketing and licensing agreement. Vanguard notified PEAT that it "would no longer accept invoices from PEAT relating to [the] Phase II [project]" in February of 1999.[34]

**M. June 23, 1999 — "The Original Action"**

PEAT filed suit against Vanguard in this court on this date,[35] alleging breach of contract, trade secret misappropriation, unfair

---

[32] *See id.* ¶ 26.

[33] *Id.*

[34] *Id.* ¶ 33.

[35] *See PEAT, Inc. v. Vanguard Research, Inc.*, Civil Action No. CV-99-S-1631-NE (N.D. Ala. June 23, 1999) (complaint from that case attached as Exhibit "J" to defendant's exhibits in support of its motion to dismiss, transfer, or stay).

competition, breach of fiduciary duty, and breach of the duty of good faith and fair dealing.[36]

**N.    July 16, 1999**

Vanguard moved to dismiss PEAT's original action on this date for lack of personal jurisdiction or, in the alternative, to transfer it to the Eastern District of Virginia under 28 U.S.C. § 1404(a). Vanguard contended PEAT had failed to establish personal jurisdiction, under theories of either general or specific jurisdiction, in accordance with Alabama's long-arm statute and the Fourteenth Amendment due process clause. Further, Vanguard argued that the Eastern District of Virginia was a more appropriate forum in which to adjudicate PEAT's claims, because the majority of activity between the parties occurred within that district.

**O.    August 17, 1999**

Vanguard made an arbitration demand relating to certain claims it had against PEAT relating to the "Phase I" subcontract on this date.[37] Vanguard asked an arbitrator to award it declaratory relief along with damages for breach of the subcontract and fraud.[38] More

---

[36] *See id.* at 6-11.

[37] *See* Exhibit "O" to defendant's exhibits in support of its motion to dismiss, transfer, or stay.

[38] *See* Demand for arbitration and claim by Vanguard Research, Inc., before the American Arbitration Association, No. 16 181 00120 99, at 5-8, attached as part of Exhibit "O" to defendant's exhibits in support of its motion to dismiss, transfer, or stay.

14

specifically, Vanguard asked the arbitrator to declare that it "has

the right to use PEAT technology for PEPS" by virtue of the

Subcontract and the license agreements it has been granted[,] and

is not obligated to pay PEAT any royalties."[39]   Further, Vanguard

contended PEAT "breached its obligation under the [s]ubcontract"

> by (a) not performing work in a manner that ensures the
> safe operation of the system, (b) not providing value for
> work performed, (c) making claims in the Lawsuit [i.e.,
> the original action:  Civil Action No. CV-99-S-1631-NE]
> that are the subject of the Subcontract's arbitration
> agreement, and (d) not dealing fairly and in good faith
> with Vanguard. [40]

Finally, Vanguard summarized a number of allegedly fraudulently

representations made by PEAT, including

> that (1) PEAT had developed a system that had proven
> effective in processing heterogeneous organic waste
> streams, e.g., medical waste, in a safe manner, (2) PEAT
> has demonstrated its ability to attract first-class
> science and engineering personnel, (3) PEAT possessed a
> proprietary system control and data acquisition package
> that required only minor tailoring to accommodate
> different waste streams and system modifications, and (4)
> PEAT possessed certain manufacturing and complete system
> installation capabilities. [41]

PEAT, in turn, contested the arbitrability of Vanguard's claims,

and refused to permit an arbitrator to decide that issue.

---

[39] *Id.* ¶ 18.

[40] *Id.* ¶ 22.

[41] *Id.* ¶ 25 (emphasis in original).

15

**P.    September 9, 1999**

This court granted Vanguard's motion to transfer the original

action filed by PEAT to the Eastern District of Virginia on this

date.[42]

> Upon consideration of the motions, briefs, exhibits, and
> pleadings, this court concludes it lacks personal
> jurisdiction over defendant, and that proper venue lies
> in the United States District Court for the Eastern
> District of Virginia.  Therefore, defendant's motion to
> transfer to the Eastern District of Virginia, Alexandria
> division, is **granted**, pursuant to 28 U.S.C. § 1406(a).
> As further basis for such ruling, the court adopts the
> arguments set forth in defendant's brief. [43]

The court premised that ruling primarily on the fact that PEAT's

counsel failed to respond to Vanguard's motion, filed on July 16,

1999.[44]  Vanguard's assertions in support of transfer were thus

uncontested on the date this court entered its order transferring

the original action.

PEAT requested reconsideration of the decision to transfer.

It attributed its failure to respond to Vanguard's motion to

dismiss or transfer to an alleged miscommunication with one of this

court's clerks, and further contended that Vanguard had grossly

misstated the facts in its motion to transfer.  This court denied

---

[42]  *See* Order of Sept. 9, 1999, in Civil Action No. CV-99-S-1631-NE,
attached as Exhibit "K" to defendant's exhibits in support of its motion to
dismiss, transfer, or stay.

[43]  *See id.* at 1-2 (footnote and citation omitted) (emphasis in original).

[44]  *See supra* Section I.N.

16

PEAT's motion on September 17, 1999, after concluding "it ha[d] no
jurisdiction to review its order of transfer."[45]    This court,
nonetheless, was "extraordinarily dismayed" at the content of
PEAT's motion:

> First, the gravamen of the motion is that defendant
> has committed a fraud on this court. This is a matter
> never considered lightly by any court.
>
> Second, the court is at a complete loss of
> understanding as to how counsel for the plaintiff would
> fail to respond to defendant's motion to transfer in any
> manner other than the alleged assertion by such counsel
> that a telephone call was made to a law clerk of the
> undersigned.   When dealing with a law firm [of the
> caliber of PEAT's counsel], the court construes silence
> for a long period of time to be confession.[[46]]

**Q.    September 16, 1999 — Dismissal of the Original Action**

Left with no recourse in this court, PEAT opted on this date
to dismiss the original action that had been transferred to the
Eastern District of Virginia pursuant to Federal Rule of Civil
Procedure 41(a).[47]

**R.    September 21, 1999 — Vanguard's Intervening Action**

Vanguard filed a declaratory judgment action in the United
States District Court for the Eastern District of Virginia on this

---

[45] Order of Sept. 17, 1999, in Civil Action No. CV-99-S-1631-NE, attached
as Exhibit "M" to defendant's exhibits in support of its motion to dismiss,
transfer, or stay.

[46] *Id.* at 1-2.

[47] *See* Exhibit "N" to defendant's exhibits in support of its motion to
dismiss, transfer, or stay.

17

date.[48]    Vanguard sought a judicial declaration that the claims

asserted by it in the arbitration demand are arbitrable pursuant to

section 34 of the subcontract and the Federal Arbitration Act, 9

U.S.C. § 1 et seq.[49]    The Honorable Claude M. Hilton, Chief Judge

of the Eastern District of Virginia, denied PEAT's motion to

transfer Vanguard's action to the Northern District of Alabama on

December 15, 1999.[50]

## S.    September 23, 1999 — "The Present Action"

Just two days after Vanguard filed its declaratory judgment

action in the Eastern District of Virginia, PEAT filed the present

action in this court.  The complaint asserted nine claims against

Vanguard: breach of the marketing and licensing agreement relating

to the "Phase I" project;[51] breach of the marketing and licensing

agreement relating to the "Phase II" project;[52] trade secret

---

[48] See Vanguard Research, Inc. v. PEAT, Inc., Civil Action No. 99-1412-A
(E.D. Va. Sept. 21, 1999) (attached as Exhibit "P" to defendant's exhibits in
support of its motion to dismiss, transfer, or stay).

[49] See id. at 1, 6-7.

[50] See Order of Dec. 15, 1999, in Civil Action No. 99-1412-A (E.D. Va.),
attached to defendant's submission of additional authority in support of its
motion to dismiss, transfer, or stay (Doc. No. 25).

[51] "Vanguard is not licensed by PEAT to operate the 'Phase I' PEPS unit
delivered by PEAT and may not modify the PEPS unit without approval by PEAT.  The
operation and/or modification of the PEPS unit without PEAT's involvement is in
breach of the express obligations of Vanguard under the Marketing & Licensing
Agreement."  (Complaint ¶¶ 35-36.)

[52] "Under the terms of the Marketing & Licensing Agreement, Vanguard is
obligated to use PEAT as the sole source for manufacturing and all TDR/PEPS
efforts.  Vanguard's preparation of PEPS' design specifications without PEAT's

18

misappropriation relating to both projects;[53] trade secret

misappropriation relating to Vanguard's alleged disclosure of

PEAT's technology to potential vendors;[54] breach of the non-

disclosure agreement;[55] unfair competition;[56] breach of fiduciary

duty;[57] breach of the duty of good faith and fair dealing;[58] and, a

---

assistance and any attempt by Vanguard to build a mobile PEPS unit [as part of the 'Phase II' contract] without PEAT's participation is a breach of the Marketing & Licensing Agreement." (Complaint ¶¶ 40-41.)

[53] "Vanguard was given access to PEAT's valuable trade secrets in the know-how related to the commercial operation of the TDR Technology solely for the purpose of marketing such TDR Technology. Vanguard's misappropriation of PEAT's valuable trade secrets in operating and/or modifying the Phase I PEPS unit [and preparing design specifications for a mobile Phase II PEPS unit] constitutes a violation of Ala. Code (1993 repl. vol.) § 8-27-3." (Complaint ¶¶ 44-46.)

[54] "PEAT is informed and believes that Vanguard has disclosed PEAT's valuable trade secret information to potential vendors to determine their respective abilities to provide materials for Vanguard to build a mobile PEPS unit. Vanguard's unauthorized disclosure of PEAT's valuable trade secrets constitutes trade secret misappropriation in violation of Ala. Code (1993 repl. vol.) § 8-27-3." (Complaint ¶¶ 50-51.)

[55] "PEAT is informed and believes that Vanguard has disclosed PEAT's valuable proprietary information to potential vendors to determine their respective abilities to provide materials for Vanguard to build a mobile PEPS unit. Vanguard's unauthorized disclosure of PEAT's valuable proprietary information constitutes a breach of its contract with PEAT that it would not disclose such information." (Complaint ¶¶ 55-56.)

[56] "PEAT is informed and believes that Vanguard has falsely informed potential customers of PEPS units that Vanguard owns the technology for the PEPS units, which technology was actually developed and owned by PEAT. Such false statements by Vanguard cause confusion in the marketplace as to the source of PEAT's Technology and irreparably damage PEAT's valuable goodwill in the industry. Such false statements by Vanguard are a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)." (Complaint ¶¶ 58-60.)

[57] "Vanguard owed a fiduciary duty to PEAT to seek out opportunities that would enure to the benefit of both parties and a fiduciary duty to not usurp such opportunities for its own benefit. Vanguard's efforts to design and operate PEPS units without the participation of PEAT has denied PEAT the profits it is entitled to under the License and Marketing Agreement and is a breach of Vanguard's fiduciary duty to PEAT." (Complaint ¶¶ 65-66.)

[58] "Vanguard owes an implied duty of good faith and fair dealing to PEAT in carrying out the terms of the contract. Without justification and in bad

19

request for declaratory relief.[59]  PEAT voluntarily dismissed this
last count on February 8, 2000.[60]

**T.   October 20, 1999**

Vanguard moved to dismiss, transfer, or stay the present
action on this date.[61]

**U.   February 7, 2000**

Chief Judge Hilton of the Eastern District of Virginia
transferred Vanguard's intervening, declaratory judgment action to
the United States District Court for the District of Columbia on
this date.  The District of Columbia was declared the proper venue,
because PEAT and Vanguard had agreed to arbitrate claims arising
under the subcontract in Washington, D.C.

> According to the Federal Arbitration Act, a Plaintiff may
> bring suit "in any federal district Court which, save for
> such agreement, would have jurisdiction under Title 28."
> 9 U.S.C. § 4.  However, the broad authority granted by
> the statute "quickly narrows," Merrill Lynch, Pierce,

---

faith, Vanguard has ignored the express language of the contract and attempted
to use PEAT's proprietary TDR Technology for its own profit, rather than
including PEAT in the design, construction, modification, and operation of PEPS
units based on PEAT's Technology."  (Complaint ¶¶ 71-72.)

[59] "Vanguard's Demand for Arbitration asserted that its claims were subject
to arbitration based on an arbitrability clause in Paragraph 34 of the TVA
Subcontract.  That clause only requires arbitration of disputes between PEAT and
the Government Contracting Officer arising under the TVA Subcontract, however,
and does not require arbitration of any of the claims identified by Vanguard in
its Demand for Arbitration."  (Complaint ¶ 77.)

[60] See Doc. No. 29.  Had PEAT not voluntarily dismissed its request for
declaratory relief, that claim would have been dismissed by the court under the
"first to file" rule, discussed infra.

[61] See Doc. No. 6 and accompanying brief.

20

Fenner & Smith, Inc. v. Lauer, 49 F.3d 323, 327 (7th Cir.
1995), and states that "the hearings and proceedings ...
shall be filed within the district in which the petition
for an order directing such arbitration is filed."  9
U.S.C. § 4.   Many other courts have interpreted that
provision to mean that: "where the arbitration agreement
contains a forum selection clause, only the district
court in that [selected] forum can issue a § 4 order
compelling arbitration."

. . .

    In this case, the forum selection clause clearly
chooses Washington, D.C. as the site of arbitration.   It
seems clear under 9 U.S.C. § 4 that this case should
therefore be transferred to the United States District
Court for the District of Columbia where jurisdiction
would be appropriate.[62]

## II. DISCUSSION

Before addressing Vanguard's contentions, this court comments

on the interplay between the various agreements executed by the

parties and PEAT's remaining eight claims against Vanguard in the

present action.   This court's initial impression is that PEAT's

claims relating to "Phase I" should be addressed separately from

its claims relating to "Phase II."  With respect to "Phase I," the

parties actually executed a subcontract in accordance with the

marketing and licensing agreement.   That subcontract contains an

arbitration clause.   The parties failed to execute a subcontract

for "Phase II," however.   Documents relied upon in PEAT's "Phase

---

[62] Memorandum opinion entered February 7, 2000, in Civil Action No. 99-
1412-A (E.D. Va.), at 2-3 (emphasis in original) (citations omitted).

21

II" claims are the marketing and licensing agreement and the non-
disclosure agreement.    Examination of PEAT's complaint reveals
that differentiating "Phase I" from "Phase II" is difficult,
because factual allegations related to both projects loom in at
least four of the eight counts.[63]   PEAT justifies intertwining
"Phase I" and "Phase II" claims on the basis that its causes of
action arise solely under the marketing and licensing agreement,
along with the non-disclosure agreement, but not the "Phase I"
subcontract or any claim brought under a specific "Phase II"
document.   This court rejects that argument.

     The marketing and licensing agreement serves as a document of
general understanding between the parties.  As exemplified by the
provisions cited above, see supra pages 8-11, it delineates what
PEAT and Vanguard will individually contribute to their joint
endeavor.    More importantly, however, it clearly provides that
later agreements will govern the relationship of the parties in the
event they procure contracts to employ the PEPS system and TDR
technology.   Article 7 of the marketing and licensing agreement, in
which the parties agreed that "[s]pecific rights and remedies, in

---

[63] Counts I, II, IV, and V focus solely on one project or the other.  See
Complaint ¶¶ 35 ("Phase I"), 39 & 42 ("Phase II"), 50 ("Phase II"), 55 ("Phase
II").  Otherwise, PEAT's allegations cover the entire gamut of Vanguard's conduct
in connection with both the "Phase I" and "Phase II" projects.

22

the event of default, will be negotiated and specified in each contract arising out of and under" that agreement, evidences this point. In essence, the various policies and purposes behind enactment of the marketing and licensing agreement are not operative until PEAT and Vanguard achieve success in the procurement of government contracts.

This court finds the Fifth Circuit's analysis in *Neal v. Hardee's Food Systems, Inc.*, 918 F.2d 34 (5th Cir. 1990), persuasive by analogy. In that case, plaintiff entered into a series of agreements with defendant for the purpose of becoming a Hardee's franchisee. First, the parties executed a purchase agreement for buildings, land, and personal property comprising six Hardee's restaurants. That agreement contained no arbitration clause. Next, the parties executed license agreements for each of the six restaurants. Those agreements contained a broad arbitration clause. When plaintiff did not profit from operation of the restaurants, he sued defendant for "violations of the Texas Deceptive Trade Practices Act, breach of contract, fraud, and breach of the covenant of good faith and fair dealing." *Id.* at 36. The Fifth Circuit reversed the trial court's decision not to stay plaintiff's lawsuit in lieu of arbitration, based on the

23

applicability of the arbitration clause contained within each individual license agreement. It rejected plaintiff's contention that all of his claims were premised on the purchase agreement:

> Neal relies upon the absence of an arbitration clause in the Purchase Agreement. His contention asks us to view each of the agreements in isolation, ignoring the obvious purpose of the individual transactions. But Hardee's and Neal contracted to transfer rights to a business. Although the parties used multiple agreements to delineate their relationship, each agreement was dependent upon the entire transaction. It existed to further the single goal of making Neal a Hardee's franchisee. The individual agreements were integral and interrelated parts of the one deal.

Id. at 37 (emphasis supplied) (noting that the purchase agreement and license agreements are interdependent). The Fifth Circuit pinpointed that the overall objective of the parties was to make plaintiff one of defendant's franchisees. Given that the purchase agreement was entered into as a necessary prerequisite to the execution of the license agreements, the Fifth Circuit held that a liberal interpretation of the arbitration provisions was warranted. Plaintiff could not avoid arbitration by referring only to the purchase agreement.

> The keystone of the deal between the parties was the transfer of franchise rights pursuant to the License Agreements. Without the franchise rights, the parties concede that they would not have executed the Purchase Agreement. The parties chose to include a broad arbitration clause in the License Agreements. Recognizing that the License Agreements were the heart of

24

their deal, it is logical that the parties would have
expressed their intent to arbitrate all of their disputes
in a provision in those agreements. We hold that when
the parties included a broad arbitration clause in the
essential License Agreements covering "any and all
disputes," they intended the clause to reach all aspects
of the parties' relationship including the purchase of
the physical properties.

*Id.* at 38 (emphasis supplied).

Since the initial marketing agreement entered into by PEAT's

predecessor (MHN) and Vanguard (*see* Section I.B. *supra*), the

purpose behind collaboration has been to "jointly market and secure

[government] contracts." While the current marketing and licensing

agreement cannot be considered a "formality," it, as well as the

non-disclosure agreement, is but a means to an end. The prime

contract entered into by the TVA and Vanguard, along with Vanguard

and PEAT's accompanying subcontract, are examples of the "keystone"

of the arrangement initially contemplated by the parties. *Neal*,

918 F.2d at 38. Those documents form the "heart" of the deal

between the parties. *Id*.

For those reasons, the court rejects PEAT's arguments that its

claims solely implicate the marketing and licensing agreement and

the non-disclosure agreement. Those documents cannot be read in

isolation when addressing the "Phase I" claims. Accordingly, this

court distinguishes PEAT's claims arising out of the "Phase I"

project from those involving "Phase II."

Vanguard argues, nevertheless, that none of PEAT's claims should remain before this court. First, it claims the "first to file" rule warrants dismissal. Second, Vanguard argues that this court is precluded by the doctrine of collateral estoppel from asserting personal jurisdiction over it. Third, Vanguard contends that the Federal Arbitration Act mandates that this court stay the action. Fourth, it claims that dismissal or transfer is required based on improper venue. Finally, Vanguard argues transfer is appropriate under 28 U.S.C. § 1404. The court addresses these arguments in turn.

## A. "First to File" Rule

Vanguard contends this case should be dismissed based on the "first to file" rule. The Eleventh Circuit summarized that rule in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 675 F.2d 1169 (11th Cir. 1982):

> In absence of compelling circumstances, the court initially seized of a controversy should be the one to decide the case. It should make no difference whether the competing courts are both federal courts or a state and federal court with undisputed concurrent jurisdiction.

*Id.* at 1174. *See also Ven-Fuel, Inc. v. Department of the Treasury*, 673 F.2d 1194, 1195 (11th Cir. 1982) ("In its discretion,

26

a district court may decline to entertain a declaratory judgment action on the merits when a pending proceeding in another court will fully resolve the controversy between the parties."). That precedent indicates that when two cases focus on the same subject matter or controversy, the court in which the later case was filed should dismiss in light of the need for judicial efficiency and comity.

Vanguard contends that its intervening, declaratory judgment action, now pending in the District of Columbia, encompasses the same subject matter or controversy as the present action filed here by PEAT. Because Vanguard filed two days before PEAT and no compelling circumstances warrant retention of PEAT's action in this court, Vanguard argues for enforcement of the "first to file" rule. This court agrees, but only in part.[64]

Vanguard seeks a declaration that certain claims it has against PEAT relating to the "Phase I" project (and *vice-versa*) are arbitrable pursuant to the arbitration clause in the parties' subcontract. PEAT, in refusing to consent to arbitration, has

---

[64] The fact that Vanguard's action has recently been transferred from its original venue in no way diminishes its "first to file" argument. *See generally* 15 Charles Alan Wright et al., *Federal Practice & Procedure* § 3846, at 362 (2d ed. 1986) ("When an action is transferred it remains what it was and all further proceedings in it are merely referred to another tribunal, leaving untouched whatever already has been done.").

27

argued that the arbitration clause does not apply to "Phase I"
claims brought by either party against the other. Thus, Vanguard's
action calls upon the district court in the District of Columbia to
delineate the scope of the clause. Likewise, a threshold issue in
the action before this court concerns whether certain claims
articulated by PEAT must be sent to arbitration pursuant to
paragraph 34 of the subcontract. Indeed, Count IX of PEAT's
complaint, which recently was dismissed voluntarily, sought a
declaration by this court that the arbitration clause "only
requires arbitration of disputes between PEAT and the Government
Contracting Officer arising under the TVA subcontract ...." Under
*Haydu*, 675 F.2d at 1174, both court are "seized of a controversy,"
*i.e.*, the proper construction of the arbitration clause in the
"Phase I" subcontract.

This court finds that the "Phase I" claims articulated by
Vanguard in its arbitration demand and subsequent declaratory
judgment action form the "same subject matter or controversy" as
those claims asserted by PEAT in the present action that relate to
"Phase I." As stated above, PEAT's professed reliance on related
agreements, such as the marketing and licensing agreement and the
non-disclosure agreement, does not distinguish the content of its

28

"Phase I" claims from those made by Vanguard.  Each party's claims initially turn on whether they are subject to arbitration.

Accordingly, all of PEAT's claims and allegations relating to the "Phase I" project are due to be dismissed without prejudice under the "first to file" rule, but without prejudice to PEAT's right to petition this court to reinstate such claims, in the event the District of Columbia district court ultimately determines that PEAT should not be compelled to submit to arbitration.  (If the District of Columbia district court interprets the phrase "[a]ny dispute not disposed of in accordance with this provision" broadly, each party will have to submit its "Phase I" claims to arbitration. If that court agrees with PEAT, however, and construes that language narrowly, PEAT may refile its "Phase I" claims here. Regardless, PEAT is not unduly prejudiced.)

In the interest of comity and judicial efficiency, the District of Columbia district court should have the opportunity to determine the scope of the arbitration clause located in the parties' "Phase I" subcontract.   That issue, potentially dispositive of a great portion of PEAT's action here, was first presented to the District of Columbia district court. Further, the reasons given by the Eastern District of Virginia district court for transferring Vanguard's action to the District of Columbia

29

provide this court with more justification in opting not to decide the scope of the "Phase I" arbitration clause. *See Merrill Lynch, Pierce, Fenner & Smith v. Lauer,* 49 F.3d 323, 330 (7th Cir. 1995) ("In contrast, prearbitration litigation is intended to lead directly to, and to focus on, the future arbitration proceeding. It is a path that should narrow, not widen, as the arbitration draws nearer. A light tread on that path shows greatest respect for the laudable principles of judicial economy ....").

PEAT's "Phase II" claims, on the other hand, do not form part of the same subject matter or controversy. The "first to file" rule is inapplicable to those claims. The marketing and licensing agreement provides that rights and remedies in the event of default shall be determined on a project-specific basis. Without encroaching upon the District of Columbia district court's ability to construe the arbitration clause in the "Phase I" subcontract, this court can definitively say that "Phase II" claims do not fall within the ambit of that provision. This court, therefore, must analyze the viability of PEAT's "Phase II" allegations in light of Vanguard's alternative grounds for dismissal, transfer, or stay.

**B.  Collateral Estoppel**

Vanguard contends this court's determination that it lacked personal jurisdiction over Vanguard in the original action

30

precludes this court from relitigating that issue now. Collateral estoppel is a procedural mechanism. Therefore, this court must apply federal law in analyzing Vanguard's argument. *See Stovall v. Price Waterhouse Company*, 652 F.2d 537, 540 (5th Cir. 1981) ("We believe that the prior decisions of this Court [relating to] ... collateral estoppel require application of the federal rule when ... a party seeks to estop a claim from being raised in a diversity action brought in federal court on the basis of an earlier determination made in a federal court sitting pursuant to its diversity jurisdiction ....").[65]

"[C]ollateral estoppel precludes the relitigation of an issue that has already been litigated and resolved in a prior proceeding." *Pleming v. Universal-Rundle Corporation*, 142 F.3d 1354, 1359 (11th Cir. 1998). The Eleventh Circuit recently noted that "dismissal due to a lack of personal jurisdiction" may have preclusive effect in a later proceeding between the same parties. *Posner v. Essex Insurance Company, Ltd.*, 178 F.3d 1209, 1221 (11th Cir. 1999).

A number of requirements must be met, however, in order for the doctrine of collateral estoppel to apply. The Eleventh Circuit

---

[65] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

31

recently reiterated those requirements in *Pleming*:

> To claim the benefit of collateral estoppel the party
> relying on the doctrine must show that: (1) the issue at
> stake is identical to the one involved in the prior
> proceeding; (2) the issue was actually litigated in the
> prior proceeding; (3) the determination of the issue in
> the prior litigation must have been "a critical and
> necessary part" of the judgment in the first action; and
> (4) the party against whom collateral estoppel is
> asserted must have had a full and fair opportunity to
> litigate the issue in the prior proceeding.

*Pleming*, 142 F.3d at 1359.   It is clear that the first three

requirements are satisfied upon examination of PEAT's prior action

against Vanguard, Civil Action No. CV-99-S-1631-NE (N.D. Ala. June

23, 1999) (transferred by order entered September 9, 1999, and

subsequently dismissed).   *See Pleming*, 142 F.3d at 1359 (noting

that actual litigation requirement is met "'merely by the

designation of the question as one for trial'") (quoting *Truck

Insurance Exchange v. Ashland Oil, Inc.*, 951 F.2d 787, 792 (7th

Cir. 1992)).   Vanguard raised the identical issue of personal

jurisdiction in the prior action, and this court's determination

that it lacked personal jurisdiction proved dispositive in the

decision to transfer.

Vanguard's collateral estoppel argument fails at the fourth

step of the analysis, however, because PEAT did not have a "full

and fair opportunity" to litigate the issue of personal

32

jurisdiction in its previous action before this court.  As stated earlier, this court concluded it initially lacked personal jurisdiction over Vanguard based on the arguments made by Vanguard for transfer and the lack of any response from PEAT.  In light of this court's expedited transfer, it was without jurisdiction to entertain PEAT's motion for reconsideration.  That motion not only based PEAT's failure to respond on a miscommunication with officers of this court, but also attributed serious misstatements of fact to Vanguard and its counsel.  Given these circumstances, this court finds PEAT was denied a "full and fair opportunity" to litigate the issue of personal jurisdiction in its previous action.  PEAT should have an opportunity to contest the evidence submitted by Vanguard on the issue of personal jurisdiction.  Thus, the doctrine of collateral estoppel is not applicable here.

Further, this court finds it has personal jurisdiction over Vanguard.  The evidentiary submissions indicate that Vanguard has sufficient minimum contacts with the State of Alabama to establish personal jurisdiction, and that exercise of that jurisdiction would not offend notions of fair play and substantial justice.  *See Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993) (noting that minimum contacts requirement is met where the

33

contacts: relate to the plaintiff's cause of action; involve some
act by which the defendant purposefully avails itself of the
privilege of conducting activities within the forum; and, are of
such a character that the defendant should reasonably anticipate
being haled into court there). *See generally International Shoe
Company v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95
(1945). More specifically, the relationship between PEAT and
Vanguard consisted of substantial activity in two states, Alabama
and Virginia. Just as personal jurisdiction could be established
in Virginia with respect to PEAT, it can be established here with
respect to Vanguard.

C.    **The Federal Arbitration Act**

Section three of the Federal Arbitration Act ("FAA") provides:

> If any suit or proceeding be brought in any of the
> courts of the United States upon any issue referable to
> arbitration under an agreement in writing for such
> arbitration, the court in which such suit is pending,
> upon being satisfied that the issue involved in such suit
> or proceeding is referable to arbitration under such an
> agreement, shall on application of one of the parties
> stay the trial of the action until such arbitration has
> been had in accordance with the terms of the agreement,
> providing the applicant for the stay is not in default in
> proceeding with such arbitration.

9 U.S.C. § 3. This court already has determined that the District
of Columbia district court should determine the scope of the
arbitration clause contained in the parties' "Phase I" subcontract.

34

*See supra* Section II.A.  As a corollary, Vanguard asserts that,
because some of PEAT's claims may be subject to the arbitration
provision contained within the parties' "Phase I" subcontract, this
court must stay all claims asserted in the present action.  PEAT
does not dispute that the FAA applies to the arbitration clause in
the subcontract.  Rather, it argues that binding precedent does not
permit this court to stay resolution of non-arbitrable claims while
other claims are being resolved by, or may be subjected to,
arbitration.

The court finds merit in PEAT's argument with respect to its
"Phase II" claims.  Supreme Court and Eleventh Circuit precedent
establish that the "better approach" in a situation like the one
before this court "is to deny motions for a stay and allow all the
proceedings to go forward without delay."  *Benoay v. Prudential-
Bache Securities, Inc.*, 805 F.2d 1437, 1441 (11th Cir. 1986)
(citing *Dimenstien v. Whiteman*, 759 F.2d 1514, 1517 (11th Cir.
1985).  *See also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213,
225, 105 S.Ct. 1238, 1245, 84 L.Ed.2d 158 (1985) (White, J.,
concurring) ("In addition, once it is decided that the two
proceedings are to go forward independently, the concern for speedy
resolution suggests that neither should be delayed.  While the

35

impossibility of the lawyers being in two places at once may require some accommodation in scheduling, it seems to me that the heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course."). Thus, this court will proceed with adjudication of PEAT's "Phase II" claims.

**D. Venue**

Vanguard also contends venue is improper in the Northern District of Alabama based on 28 U.S.C. § 1391. Because this action is founded solely on diversity, paragraph (a) of that statute is relevant:

> **(a)** A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). Based on the evidence submitted by both parties, this court finds that venue is proper here, because a "substantial part of the events or omissions giving rise to [PEAT's] claim[s] occurred" in Alabama. 28 U.S.C. § 1391(a)(2). Chief Judge Hilton's decision not to transfer Vanguard's

36

declaratory judgment action here is inapposite, as venue may properly lie in more than one district.

**E.   Transfer**

Finally, Vanguard argues that transfer to the Eastern District of Virginia is again appropriate, because it is more convenient to the parties and witnesses and "in the interest of justice." 28 U.S.C. § 1404(a). Vanguard's contentions as to PEAT's "Phase I" claims are moot, given that they shall be dismissed without prejudice to PEAT's right to reassert them in the District of Columbia district court.

As to PEAT's "Phase II" claims, the decision to transfer is within the sound discretion of the trial court. *See Ross v. Buckeye Cellulose Corporation*, 980 F.2d 648, 654 (11th Cir. 1993); *England v. ITT Thompson Industries, Inc.*, 856 F.2d 1518, 1520 (11th Cir. 1988). Courts traditionally afford a plaintiff's initial choice of forum considerable deference. *See Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947); *In re Ricoh Corporation*, 870 F.2d 570, 573 (11th Cir. 1989). Therefore, the movant must "establish that the suggested forum is more convenient." *Ricoh Corporation*, 870 F.2d at 573. "Section 1404(a) provides for transfer to a more convenient forum,

37

but not to one which is likely to prove equally convenient or

inconvenient." *Johnston v. Foster-Wheeler Constructors, Inc.*, 158

F.R.D. 496, 503 (M.D. Ala. 1994). If the balance of factors is

only slightly in favor of transfer, plaintiff's choice of forum

should be upheld. *See id.*

In *Gulf Oil Corporation*, the Supreme Court outlined a number

of factors to consider when assessing whether transfer is in the

interest of justice. According to the Court:

> Important considerations are the relative ease and access
> to sources of proof; availability of compulsory process
> for attendance of unwilling, and the cost of obtaining
> attendance of willing, witnesses; possibility of view of
> premises, if view would be appropriate to the action; and
> all other practical problems that make trial of a case
> easy, expeditious and inexpensive.

*Gulf Oil Corporation*, 330 U.S. at 508, 67 S.Ct. at 843. The Court

also has stated that transfer motions should be analyzed "on an

individualized case-by-case consideration of convenience and

fairness." *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805,

812, 11 L.Ed.2d 945 (1964).

Transfer of PEAT's "Phase II" claims is not warranted, because

doing so would simply shift the inconvenience in this case to PEAT.

*See Johnston*, 158 F.R.D. at 503. PEAT's original choice of forum

should be entitled to substantial deference and not disturbed,

38

despite this court's decision to transfer in PEAT's prior case. The evidence submitted by PEAT in rebuttal to Vanguard's assertions of Virginia as a more convenient forum emphasizes that this action should proceed here.

### III. CONCLUSION

For the reasons stated above, defendant's motion to dismiss, transfer, or stay this action is due to be granted in part and denied in part. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this $7\frac{th}{}$ day of March, 2000.

_____
United States District Judge

39